2019 IL App (1st) 172643-U

THIRD DIVISION
December 11, 2019

No. 1-17-2643

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 2787 |
| | ) | |
| ERIK FLORES, | ) | Honorable |
| | ) | James Karahalios, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirmed. Evidence was sufficient to prove predatory and attempt predatory criminal sexual assault beyond reasonable doubt. Trial court properly admitted minor victim's out-of-court statements under section 115-10, barred testimony of victim's therapist at Children's Advocacy Center, and admitted video of victim sensitive interview. IPI 3.02 was properly given; IPI 11.104 did not require modification; and IPI 3.11 was properly refused. Defendant's sentence was not abuse of discretion, one-act, one-crime violation, or double enhancement.

¶ 2    A jury convicted defendant Erik Flores of predatory criminal sexual assault and attempt predatory criminal sexual assault of T.C., a five-year-old boy. Defendant raises numerous issues on appeal. He says the evidence was insufficient to prove any of the charges beyond a reasonable doubt. He argues that the trial court erred in admitting or excluding several pieces of evidence; and that various jury instructions were either improperly given, improperly withheld, or unduly

confusing. And he contests his sentence, arguing that it was excessive and in violation of the one-act, one-crime rule, which he also equates with a double enhancement. Finding no error of any kind, we affirm.

¶ 3                                          BACKGROUND

¶ 4       Defendant was found guilty on three counts of predatory criminal sexual assault of a child (PCSA) and one count of attempt PCSA. The PCSA charges alleged (1) contact between defendant's hand and T.C.'s genitals "on or about September 27, 2015;" (2) contact between defendant's genitals and T.C.'s hand; and (3) contact between defendant's hand and T.C.'s genitals, both occurring "on or about October 20, 2014 and continuing on through September 26, 2015." The attempt PCSA charge alleged that defendant pushed T.C.'s head toward his exposed penis sometime "between October 20, 2014 and September 26, 2015."

¶ 5       The victim, T.C., was 5 years old at the time of the alleged assaults. T.C. lived with his mother, Kaitlin C., and his grandmother, in a 2-bedroom townhouse. T.C. and Kaitlin shared one bedroom; Katilin's mother slept in the other. The only full bath in the house was upstairs, adjoining the two bedrooms.

¶ 6       Kaitlin testified that she considered defendant her best friend and "one of the best people" she knew. They had been friends for around 12 years, since junior high school. For a brief time they had referred to themselves as dating, but that was just a "label," since they never really went on a date and their relationship did not change during that period. Defendant was present in the delivery room when T.C. was born, and he was routinely at Kaitlin's house. All in all, he was the equivalent of "family" to T.C. and Kaitlin, and T.C. knew him affectionately as "Uncle Erik."

¶ 7        Kaitlin hosted a barbeque for some friends in her backyard on the evening of Saturday, September 26, 2015. The crowd began to whittle down around 8 pm, when several friends and

their kids left after roasting marshmallows over a bonfire. T.C. stayed up later than usual for the festivities. Kaitlin and her mother put him to bed around 10 or 10:30 p.m. Although T.C. usually slept in Kaitlin's room, that night he went to bed in his grandmother's room, in the front of the house, where the noise from the backyard would not disturb him. The gathering lasted past midnight, into the early morning hours of September 27, 2015, with defendant, Kaitlin, her mother, and a friend named Georgi hanging out in the backyard.

¶ 8    Around midnight, Georgi went for a walk while talking to his girlfriend on his cellphone. The two were "always fighting" and having "issues." After a few minutes, defendant ostensibly went to find Georgi and check on him. Defendant went into the house through the back door. When neither defendant nor Georgi returned after a time, Kaitlin got up to look for them. But she was thirsty, so she stopped in the kitchen first to get some water.

¶ 9    In the kitchen, Kaitlin heard "creaks in the house as if somebody was upstairs." Since T.C. should have been asleep, and nobody else should have been upstairs, Kaitlin immediately went to check on him. While walking up the stairs, she turned on the upstairs lights and heard footsteps coming from her mother's bedroom. She then saw defendant as he came "barreling" or "running" out of that bedroom. He was a couple of steps from the threshold of the doorway, on his way out of the bedroom, when she confronted him and asked what he was doing. Defendant answered that "he was checking on [T.C.]." Kaitlin said that T.C. would call her if he needed anything, and that defendant didn't need to check on him while he was sleeping.

¶ 10    Kaitlin looked into her mother's room and saw T.C. in the bed, looking "half asleep" and "sitting up on his knees naked with his just woken face, you know irritated woken up, not a happy face." (When it was hot, T.C. sometimes slept naked, or wore just a long t-shirt or his underwear to bed. Kaitlin testified it was "summer" at the time, but she did not testify about how

T.C. was dressed for bed that night.) Kaitlin tried to get into the bedroom, but defendant stood in the doorway and would not let her pass. Kaitlin told defendant to "get out;" instead, he sat down on the edge of the bed. Kaitlin had to tell him to leave 5 or 6 times before he eventually went downstairs.

¶ 11    Kaitlin lay down in bed with T.C. and asked if he was okay. Still "half asleep" and seemingly "unable to say a word," T.C. nodded his head up and down. Kaitlin asked T.C. if Uncle Erik "touched him." T.C. nodded his head up and down again and patted his penis with his hand. Although Kaitlin had never imagined "in [her] wildest dreams" that defendant might do such a thing, she asked T.C. that question because the circumstances were too "discomforting" and "eerie," and the look on T.C.'s face was "unsettling." But Kaitlin did not press T.C. for details at the time. She let him be, and after 10 or 15 minutes, he fell back asleep. Kaitlin went downstairs to smoke a cigarette, and then went back upstairs, locked the bedroom door, and got into bed with T.C.

¶ 12    Kaitlin explained that she did not stay downstairs, confront defendant, or ask him to leave because she was "bothered" and "very irritated" by what appeared to be happening, and she felt like she "needed to go to bed" immediately. As she summed up, "it was just bad."

¶ 13    T.C. was "affectionate," as he always was, when he awoke the next morning, kissing and hugging his mom. They talked for a while, and then Kaitlin asked T.C. again whether Uncle Erik had touched him. That's when T.C. "dropped a bomb and just told [her] everything."

¶ 14    T.C. told Kaitlin that defendant "touched him a lot." Defendant put his hand in T.C.'s pants and touched his "pee pee," meaning his penis. T.C. demonstrated to Kaitlin how defendant touched his penis using his thumb and index finger. He recounted an incident in which defendant took T.C.'s hand, put it in defendant's pants, and made T.C. touch defendant's penis. In another

incident, defendant went into the upstairs bathroom while T.C. was taking a bath, exposed his penis, put his hand on the back of T.C.'s head, and, as T.C. said, "tried to get me to put his pee pee in his mouth." T.C. moved his hand across his face and said "yuck." T.C. said again that defendant touched him "often, like a lot," and that he was five years old when it all happened.

¶ 15    According to Kaitlin, defendant was never allowed to give T.C. a bath or take a bath with him. Nor did defendant ever babysit T.C. or stay with him at the house alone. But defendant was often home with T.C. and Kaitlin's mother in the evening, after Kaitlin went to work at 9:00 p.m.

¶ 16    Defendant came over around noon on Sunday, soon after T.C. revealed these allegations to Kaitlin. But he did not stay long, as Kaitlin had nothing to say to him. Kaitlin went to work that evening and came home on Monday morning, September 28, 2015. She went to the police station later that day and reported what she had seen on Saturday night and what T.C. had told her. On cross-examination, Kaitlin did not recall whether she told Detective Escobar that she confronted defendant at the party and asked if he touched T.C.'s penis, to which defendant reportedly answered, "Why would I do something like that?"

¶ 17    Kaitlin explained that she did not go to the police immediately because she was "in a shell shock" and "didn't really know what to think or what to make of anything." She "did not want to believe" that any of this actually happened and thought she must have been "confused," given how close she and T.C. were with defendant. But eventually she got up the courage and told herself "that this is not something that you can hide from."

¶ 18    After speaking to the police, Kaitlin took T.C. to the Children's Advocacy Center of North and Northwest Cook County (CAC). A female staff member first tried to interview T.C. in October 2015, but he "completely flipped out" and ran back to the car. Eventually, in January 2016, after therapy sessions at the CAC, T.C. sat for an interview with a male staff member. T.C.

told Kaitlin that he felt more comfortable talking to a "boy" about "body parts." While Kaitlin spoke frequently to T.C. about what had happened to him, she never told him what to say when he was interviewed at the CAC.

¶ 19    T.C. was seven years old at the time of trial. He testified that defendant "used to be [his] uncle" and was at his house "all the time." Defendant touched T.C.'s penis in the bedroom when nobody else was around. Asked when and how frequently defendant touched him like that, T.C. answered, "too many times," and "[w]hen [he] was five," adding "then almost when he turned six [defendant] went to jail." Apart from this general testimony, T.C. recounted two specific incidents.

¶ 20    In one incident, defendant came into the bedroom while T.C. was trying to go to sleep and touched him under his underwear. His mom came into the room while he was still "half asleep" and asked if Uncle Erik had touched him. He nodded yes. The next day, he told his mom what defendant had been doing to him. T.C. testified that he was not going to school at the time; as he recalled, he did not start attending kindergarten until he was six.

¶ 21    In the other incident, when T.C. was "in the middle" of being five and six, defendant came into the upstairs bathroom while T.C. was taking a bath. Defendant pulled his pants and shorts down, held T.C.'s head, and "put [T.C.'s] mouth in his penis" while T.C. "was trying to pull his head back." When asked to describe defendant's penis, T.C. answered that it was "big." T.C. did not know what day of the week this happened, but it was "at night" and lasted about "a minute." At the time, T.C. believed, his mother and grandmother were both downstairs.

¶ 22    The State's final witness was Mark Parr, the executive director of the CAC. Parr explained that the CAC coordinated the investigative and treatment services for children suspected of being physically or sexually abused. A key function of the CAC is conducting

forensic or fact-finding interviews, called victim sensitive interviews (VSIs).

¶ 23    Parr interviewed T.C. on January 28, 2016. He did not review any police reports prior to the interview, and the only information he had was from the center's intake form, which asked for some basic background information and a brief description of the alleged abuse. Members of a "multidisciplinary team," which included Detective Escobar and an assistant state's attorney, observed the interview from behind a two-way mirror but did not directly participate.

¶ 24    Parr began by explaining the interview "rules" to T.C.: If he did not know the answer to a question, it was okay to say that he did not know; if he was confused about a question, he should say so; and he should always tell the truth. Before Parr could finish explaining the rules, T.C. interrupted him and volunteered, "okay, so a long time ago when there was a guy named my Uncle Erik that he was tricking my mom to thinking he was a good guy, but he wasn't so, he is the one that put his hand on my private parts."

¶ 25    Based on his experience as a forensic interviewer, Parr did not find this unprompted statement unusual. He told T.C. they would return to that topic, finished reviewing the rules, and offered some simple examples to confirm that T.C. understood what it meant to tell the truth. T.C. said that it meant he had to say what "really happened." Parr then returned to the topic of "Uncle Erik" and interviewed T.C. for roughly half an hour.

¶ 26    A redacted video of the VSI was played for the jury and admitted into evidence. (The redacted portions pertained to T.C.'s statements that his friend also claimed to be sexually abused by defendant.) During the interview, T.C. told Parr that when he was five, defendant put his hand on T.C.'s penis. As T.C. remembered these events, they took place both in the bedroom and the living room. And sometimes, T.C. and defendant would be at the house alone, without Kaitlin or her mother present. T.C. would roll away when defendant tried to touch him in bed.

Defendant put his hands down T.C.'s pants "10 or 11" times. T.C. also saw defendant's penis "a lot of times," perhaps "10 or 20 times." Once, when T.C. was in the bathtub, defendant came into the bathroom and told T.C. to "lick it," meaning defendant's "private part." When T.C. did not lick defendant's penis, defendant punched him. Parr asked T.C. to describe defendant's penis, and T.C. said (referring to the bathtub incident) that it was "nasty," "pointing straight," and had "a little yellow goo" on it. At one point, T.C. said that he "touched it" with his foot and eyeball, although Parr was not sure whether T.C. understood the question posed to him when he offered that response. As T.C. became increasingly fidgety and less responsive to questions, Parr wrapped up the interview.

¶ 27    The defense called Detective Escobar of the Palatine Police Department. He testified that he met with Kaitlin on September 29, 2015, when she came to the police station. Although he had an open investigation, he did not interview T.C., collect any evidence from the house, or take a DNA sample from T.C. As he explained, the protocol for an investigation involving a minor victim required him to wait until T.C.'s counseling at the CAC was completed. And because of T.C.'s age, he had to be interviewed by the CAC, not the police. Detective Escobar observed T.C.'s interview at the CAC, but he did not question T.C. directly. The charges against defendant were brought on January 28, 2016, the day that Parr completed the VSI.

¶ 28    After the jury convicted defendant, the trial court sentenced him to 8 years for each of the three counts of PCSA, and 4 years for the attempt PCSA, with all counts to run consecutively, for a cumulative sentence of 28 years. Defendant's motion to reconsider sentence was denied.

¶ 29                                     ANALYSIS

¶ 30                           I. Sufficiency of the evidence

¶ 31    Defendant argues that the evidence was insufficient to prove any of the charges beyond a

reasonable doubt. In reviewing the sufficiency of the evidence, we ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). The trier of fact is entitled to draw all reasonable inferences from both direct and circumstantial evidence, including an inference of sexual contact. *People v. Raymond*, 404 Ill. App. 3d 1028, 1041 (2010). On questions of witness credibility and the reasonable inferences to be drawn from the evidence, the trier of fact's findings are entitled to great deference but are not conclusive. *Ross*, 229 Ill. 2d at 272.

¶ 32                              A. Proof of "contact"

¶ 33    As charged in the indictment, a person commits PCSA if he is 17 years of age or older, "commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused," and the victim is under 13 years of age. 720 ILCS § 5/11-1.40(a)(1) (West 2014).

¶ 34    Citing a later amendment to the statute, defendant says that he contests the sufficiency of the evidence of "penetration." In the amended PCSA statute, "penetration" is defined to include "any contact, however slight," of the kind described in the statute under which defendant was charged. See 720 ILCS § 5/12-12(f) (West 2016). Thus, we construe defendant's arguments as a challenge to the sufficiency of the State's proof of "contact."

¶ 35    There was no physical evidence showing that defendant sexually abused T.C. Nor did he confess to doing so. The evidence against defendant thus consisted of T.C.'s testimony; his prior statements to Kaitlin and Parr, which were admitted as a hearsay exception pursuant to 725 ILCS 5/115-10 (West 2016); and the circumstantial evidence, conveyed by Kaitlin's testimony, that

defendant was alone in the bedroom with T.C. on the night of the barbeque. This evidence was sufficient to prove all four counts. We take each in turn.

¶ 36    Count 1 alleged that defendant touched T.C.'s penis, on or about September 27, 2015. Kaitlin testified that she hosted a barbeque on the evening of September 26, 2015. Sometime around midnight, she heard "creaks in the house as if somebody was upstairs." She immediately went upstairs to check on T.C., who should have been asleep—and alone—in his grandmother's bedroom. On her way upstairs, Kaitlin heard footsteps coming from that bedroom, and then saw defendant as he came "barreling" or "running" out of it. Kaitlin confronted defendant in the doorway and asked what he was doing. Defendant claimed to be "checking on [T.C.]," which, as Kaitlin reminded him, was completely unnecessary.

¶ 37    Kaitlin saw T.C. in the bed, "sitting up on his knees naked," looking "irritated" and "half asleep," as if he had just been "woken up." Kaitlin tried to go into the bedroom, but defendant stood in the doorway and would not let her pass. Once she made her way in, she told defendant to "get out," but he sat down on the bed and refused to leave. Kaitlin had to tell him to leave several times before eventually he went downstairs.

¶ 38    Once they were alone, Kaitlin asked T.C. if Uncle Erik "touched him." T.C. nodded his head up and down and patted his penis with his hand. The next morning, Kaitlin asked T.C. again if defendant had touched him, and T.C. said that defendant put his hand in T.C.'s pants and touched his "pee pee," meaning his penis—not just once, but "a lot."

¶ 39    T.C. also testified that defendant came into the bedroom one night, while he was trying to sleep, and touched him under his underwear. T.C. recalled that his mom came into the bedroom while he was "half asleep" and asked if Uncle Erik had touched him. T.C. nodded yes, went back to sleep, and talked to his mom about the incident the next day. Although T.C. did not testify that

this happened on the night of the barbeque, and he was unable to provide any other details about when this took place (other than when he was five years old), a reasonable jury, considering T.C.'s young age and viewing this evidence in the light most favorable to the State, could infer that T.C. was describing the same incident, on the night of the barbeque, to which Kaitlin also testified.

¶ 40    In the VSI, T.C. did not specifically describe this incident, at least not in any detail, but he did say that defendant touched his penis numerous times when he was five years old, and that defendant sometimes touched him when he was "in bed."

¶ 41    Taken together, this evidence was more than sufficient to prove the allegations in Count 1. Indeed, a victim's testimony alone, if it clearly describes the prohibited sexual contact, and is found credible by the trier of fact, may be sufficient to prove a charge of sexual assault, even in the absence of any corroborating physical evidence. See, *e.g.*, *People v. Hinthorn*, 2019 IL App (4th) 160818, ¶ 93; *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("the testimony of a single witness, if positive and credible, is sufficient to convict").

¶ 42    And T.C.'s testimony (and prior statements) did not stand alone. Kaitlin's testimony also provided strong circumstantial evidence. As Kaitlin immediately recognized, there was no reason for defendant to go into the bedroom or "check on" T.C. while he was asleep; if T.C. woke up and needed something, he would call for Kaitlin. These suspicious circumstances do not prove, but they do lend credence to, T.C.'s allegations of abuse.

¶ 43    The same goes for defendant's attempts to flee the bedroom and obstruct Kaitlin. When Kaitlin approached the room, suspicious that something was amiss, defendant came "barreling" or "running" out. He would have had no obvious reason to do that if he was innocently checking on T.C., as he claimed. The jury could thus reasonably infer defendant's consciousness of guilt

from his actions. See *People v. Harris*, 225 Ill. 2d 1, 23 (2007); *People v. Lewis*, 165 Ill. 2d 305, 349-50 (1995). His efforts to prevent Kaitlin from entering the bedroom (by standing in the doorway) or from talking to T.C. alone (by refusing to leave even after being told several times to "get out") only strengthen the inference that he had, and knew that he had, something to hide.

¶ 44    There was no similar circumstantial evidence to corroborate the allegations in any of the remaining counts. Thus, those convictions rest entirely on T.C.'s various statements—his trial testimony, his outcry to Kaitlin, and his VSI. But those statements clearly describe the sexual contact (or attempted contact) alleged in Counts 2-4. Thus, if the jury found T.C. credible, his statements were sufficient to prove these charges beyond a reasonable doubt. *Hinthorn*, 2019 IL App (4th) 160818, ¶ 93.

¶ 45    Count 2 alleged that defendant touched T.C.'s penis, between the dates of October 20, 2014 and September 26, 2015—that is, when T.C. was five years old, but sometime before the barbeque. When T.C. and Kaitlin talked on the morning after the barbeque, T.C. revealed that defendant had put his hand in T.C.'s pants and touched his "pee pee" before—numerous times, in fact, all when T.C. was five years old. During the VSI, T.C. said the same to Parr. And T.C. testified that "[w]hen [he] was five," defendant touched his penis in the bedroom when nobody else was around, not only on the night of the barbeque, but frequently, "too many times." So T.C. not only clearly described the contact alleged in Count 2, he did so consistently throughout his various statements.

¶ 46    Counts 3-4 alleged further acts of abuse, or attempted abuse, during the same timeframe alleged in Count 2. Count 3 alleged that defendant made T.C. touch defendant's penis. Speaking to Kaitlin on Sunday morning, after the barbeque, T.C. recounted an incident, when he was five years old, in which defendant took T.C.'s hand, put it in defendant's pants, and made T.C. touch

defendant's penis.

¶ 47    Count 4, the attempt PCSA charge, alleged that defendant pushed T.C.'s head toward defendant's exposed penis. T.C. told Kaitlin that defendant came into the bathroom while T.C. was taking a bath, exposed his penis, put his hand on the back of T.C.'s head, and, as T.C. said, "tried to get me to put his pee pee in his mouth." When Parr asked how T.C. knew that defendant wanted him to put defendant's penis in his mouth, T.C. said that defendant told him to "lick it," and he understood "it" to refer to defendant's "private part."

¶ 48    T.C. testified that defendant came into the bathroom, pulled his pants and shorts down, held T.C.'s head, and "put [T.C.'s] mouth in his penis" while T.C. "was trying to pull his head back." Granted, in contrast to his prior statements, T.C.'s testimony thus suggested more than an attempt; it suggested that defendant actually put his penis in T.C.'s mouth. But it was for the jury to decide how much weight this disparity (or perhaps mere lack of clarity) deserved in evaluating T.C.'s testimony. The jury heard competent evidence that, if found credible, was sufficient to prove the allegation in Count 4.

¶ 49    Defendant offers several reasons why the evidence was insufficient. None of them are meritorious. First, he says, there was no proof of the *corpus delicti* because he did not confess. This is a basic conceptual confusion. The State must prove two distinct propositions: (1) that a crime was committed, known as the *corpus delicti*; and (2) that the defendant committed the crime. *People v. Sargent*, 239 Ill. 2d 166, 183 (2010). A confession "may be integral" to the State's proof of the *corpus delicti*, but that proof "may not rest exclusively" on a confession. *Id.* In other words, a confession is *not sufficient* to prove the *corpus delicti*.

¶ 50    Defendant argues that a confession is *necessary* to prove the *corpus deliciti*. That is a different proposition. And it is false. *People v. Watson*, 244 Ill. App. 3d 31, 41 (1991) (victim's

testimony proved *corpus delicti* of attempted aggravated criminal sexual assault); *People v. Lara*, 2012 IL 112370, ¶ 17 ("*When* a defendant's confession is part of the *corpus delicti* proof, the State must also provide independent corroborating evidence." (emphasis added)); *Sargent*, 239 Ill. 2d at 183 (confession "*may* be" part of *corpus delicti* proof (emphasis added)).

¶ 51    Defendant argues that Kaitlin's reaction at the barbeque—in particular, her lack of any apparent "shock or outrage," and her failure to confront defendant immediately—"undercut[s]" the credibility of her testimony, and, by extension, T.C.'s credibility as well.

¶ 52    In fact, Kaitlin testified that she *was* in shock—"in a shell shock," as she put it, as T.C.'s allegations of sexual abuse first came to light. On the one hand, she was deeply "bothered" by what appeared to be happening. On the other hand, she never imagined that defendant, her best friend and T.C.'s "Uncle Erik," could do anything like this. So she didn't know, at first, what to think or what to make of anything. "[I]rritated" and confused, her immediate inclination was to lay down by her child's side, lock the door, and take up the matter in the morning, after talking to T.C. in more detail. In these circumstances—late at night, after a party, when Kaitlin likely was tired and certainly needed time for things to sink in—it is understandable that she might not be inclined to confront defendant straightaway.

¶ 53    In any event, Kaitlin's credibility was a matter for the jury to assess. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). We may not reverse defendant's convictions unless he can show that Kaitlin's testimony was so objectively implausible, in light of ordinary human experience, that no reasonable person could accept it as true. *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 45; see *People v. Cunningham*, 212 Ill. 2d 274, 280-82 (2004). He makes no such showing.

¶ 54    Detective Escobar's "inaction" in the face of Kaitlin's police report does not dent the credibility of any State witness, much less provide a basis for outright reversal. True, Detective

Escobar did not interview T.C. or collect any evidence, be it DNA from T.C. or other physical evidence from Kaitlin's house. It is unclear how DNA or other physical evidence would have (dis)proven the allegation that defendant had touched T.C.'s penis with his hand several days earlier, or, for that matter, any of the allegations of prior sexual abuse.

¶ 55    Perhaps more importantly, Detective Escobar testified that his "inaction" at the time was mandated by the protocol for an investigation involving a minor victim of sexual abuse. As he explained, protocol prohibited him from interviewing T.C. and reserved that delicate task for the CAC. And more generally, he was required to postpone his investigation until T.C.'s counseling at the CAC was completed. If Detective Escobar was simply adhering to protocol, he was not "impassive" at all, and the fact that his investigation did not launch into full swing when Kaitlin reported the alleged abuse is of no consequence.

¶ 56    Defendant argues that "the facts do not support the notion that [he] had free reign to engage in predatory conduct," because, as Kaitlin testified, he never babysat for T.C. and was never home alone with him. The State did not have to prove that defendant had "free reign" over the house. His sexual abuse of T.C. could have been surreptitious, occurring, as T.C. testified, while his mother and/or grandmother were downstairs. Indeed, Kaitlin and her mother were both at the house when defendant sexually abused T.C. at the barbeque.

¶ 57    Lastly, defendant argues that Kaitlin and T.C. were not credible witnesses because of the inconsistencies in their testimony and statements. "[I]t is for the trier of fact to judge how flaws in part of the testimony affect the credibility of the whole." *Cunningham*, 212 Ill. 2d at 283. In particular, the fact "[t]hat one witness's testimony contradicts the testimony of other prosecution witnesses does not render each witness's testimony beyond belief." *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 22, *overruled on other grounds by People v. Reese*, 2017 IL 120011, ¶ 42.

"Even 'contradictory testimony of a witness does not per se destroy [his credibility], and it remains for the trier of fact to decide when, if at all, he testified truthfully.' " (Brackets in original.) *Cunningham*, 212 Ill. 2d at 283 (quoting *Sparling v. Peabody Coal Co.*, 59 Ill. 2d 491, 498-99 (1974)).

¶ 58    A jury's determination on matters of credibility will very rarely be disturbed. And here, defendant has not given us any basis for taking that extraordinary step. He says, in a general vein, that T.C.'s VSI and trial testimony "clashed" with each other, and with Kaitlin's testimony, creating "discrepancies over the time, the dates, and the season [in which the abuse] occurred." We address discrepancies over timing in the next section. Beyond that, defendant points to only one concrete instance of an alleged inconsistency in any of the testimony, one that arises from T.C.'s statements during the VSI that (1) defendant "sometimes" touched him "in front of [his] friends," and (2) nobody else was around when defendant touched him.

¶ 59    As we have noted, T.C.'s statements were consistent, in many essentials, both with each other and with Kaitlin's testimony. Yes, there were some inconsistencies, even though defendant makes little effort to specifically identify them. But whatever weight those inconsistencies may deserve, defendant has not shown that the evidence overall was "so unreasonable, improbable, or unsatisfactory" that no reasonable person could accept it as proof, beyond a reasonable doubt, of the charged offenses. See *Wheeler*, 226 Ill. 2d at 115. That is especially true in light of T.C.'s young age, a significant factor in assessing any perceived discrepancies or lack of detail in his testimony. See *People v. Letcher*, 386 Ill. App. 3d 327, 323 (2008) (noting that a young child subjected to serial acts of abuse typically "is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts of assaults").

¶ 60    For all that defendant has said, we have no basis for overturning the jury's credibility

determinations. The evidence, taken in the light most favorable to the State, was sufficient to sustain defendant's convictions.

¶ 61                              B. Proof of specific dates of the offenses

¶ 62    Defendant next argues that the evidence was insufficient because the State did not prove "when the offenses occurred."

¶ 63    As to Count I, defendant claims that "there was no testimony the incident happened on September 27, 2015 as the indictment alleged." To be precise, the indictment alleged that the incident took place "on or about" September 27, 2015. Kaitlin testified that the barbeque was on the evening of September 26, 2015. Around midnight, or perhaps "in the early morning hours"—that is, on September 27, 2015—defendant ostensibly went looking for Georgi. A few minutes later, Kaitlin found defendant upstairs, running from the bedroom where T.C. had been sleeping. That night, and the next morning, T.C. revealed that defendant touched his penis in the bedroom.

¶ 64    Thus, there was specific testimony, from Kaitlin, that the abuse alleged in Count 1 took place "on or about" September 27, 2015. Granted, Kaitlin testified on cross-examination that she thought the barbeque was sometime in August or "toward the end" of the summer, in 2015. In assessing Kaitilin's credibility, the jury could decide for itself how much weight this disparity in her testimony deserved. To that end, Detective Escobar testified that Kaitlin came to the station on September 29, 2015, and reported events that allegedly took place on September 26 or 27. The jury could reasonably find that Kaitlin's testimony on direct examination was corroborated by Detective Escobar and thus credibly established the date of the abuse, consistent with the date alleged in the indictment.

¶ 65    The remaining counts, as we noted above, alleged acts of abuse or attempted abuse taking place within a roughly 11-month timeframe, between October 20, 2014 and September 26, 2015.

With respect to these counts, defendant continues to nominally style his arguments a challenge to the sufficiency of the evidence. But the crux of his challenge is not the sufficiency of the proof at trial; it is the specificity of the charging language in the indictment: The remaining counts, he says, alleged a "vague" timeframe and thus "lacked the specificity constitutionally required for [defendant] to prepare his defense and avoid potential double jeopardy."

¶ 66    Defendant raised this issue before trial in a motion for a bill of particulars, in which he argued that the 11-month timeframe alleged in Counts 2-4 was overly broad. The State answered. As to Counts 2-4, the State reiterated the timeframe in the indictment. Defendant filed a motion to compel further answers, which the trial court denied. As defendant acknowledges in passing, what he is really doing is challenging the trial court's ruling on that motion.

¶ 67    But the challenge never takes shape. Defendant's argument is conclusory. He cites no authority and does not discuss the applicable law. And most importantly, he makes no serious effort to explain how his ability to defend against the charges was hindered by the allegedly inadequate charging language. He does little more than summarily make two points.

¶ 68    First, defendant flatly asserts that the timeframe alleged in the indictment was "vague." But the timeframe had determinate endpoints and was perfectly clear. What defendant seems to be saying, under the rubric of vagueness, is that the timeframe was overly *broad*, as he said in his pretrial motion. Or, better, that the State was required to provide an exact date for each offense.

¶ 69    Section 111-3 of the Code of Criminal Procedure codifies the requirement of specificity in the charging document. See 725 ILCS 5/111-3(a) (West 2016). It requires the State to inform the defendant (among other things) of "the date and county of the offense as definitely as can be done." *Id.* § 5/111-3(a)(4). In child sex-abuse cases, the precise date of the offense "is not an essential factor," and the State is not required to prove it. *People v. Guerrero*, 356 Ill. App. 3d

22, 27 (2005); see also *People v. Albarran*, 2018 IL App (1st) 151508, ¶ 22. Rather, "flexibility is permitted regarding the date requirement;" the State must provide "at least some indication in the indictment," and must provide the defendant with "the best information it has," as to when the offenses occurred. *Id.*

¶ 70    Could the State have narrowed the 11-month timeframe—at least to a specific month, if not a specific date? Not according to Parr, an experienced forensic interviewer who had served as the executive director of the CAC for 18 years and conducted more than 2500 VSIs. He testified that he "would not ask a 5 year old or 6 year old what month something happened in," because that question is "developmentally beyond what children that age typically are able to tell and so it really just sets them up to fail basically."

¶ 71    For these same reasons, we have affirmed convictions in child sex-abuse cases when an extended timeframe—often significantly longer than 11 months—was alleged in the indictment. *Albarran*, 2018 IL App (1st) 151508, ¶ 17 (5 years); *Guerrero*, 356 Ill. App. 3d at 28 (3 years); *People v. Burton*, 201 Ill. App. 3d 116, 123 (1990) (33 months).

¶ 72    In short, defendant offers no basis for us to conclude that the 11-month timeframe— derived from T.C.'s consistent claims that all of the abuse took place when he was 5 years old— was less than the "best information" the State had, or could have had, to offer.

¶ 73    Second, defendant asserts that the jury "struggled with this uncertainty" as to the precise timing of the abuse alleged in Counts 2-4, as evidenced by one juror's statement to the court that "we are so confused." This statement had nothing to do with the 11-month timeframe.

¶ 74    During deliberations, the jury sent a note to the judge, stating that it was "unsure whether it happened on September 26th or 27th," and asking, "Does that matter?" Later in the day, while the judge was discussing scheduling matters with the jury, one juror said, "May I ask a question?

I don't know if this is appropriate. We had a question that was sent out here, and it wasn't answered. We are so confused."

¶ 75    The jury's note clearly referred to Count 1, the abuse on the night of the barbeque; the jury evidently was questioning whether it occurred before or after midnight. (Recall that Kaitlin testified it was sometime around midnight.) The juror's remark to the judge, later in the day, referred to that note, and voiced the jury's apparent dissatisfaction with the answer it received from the court (with the agreement of both parties). The details of that response, and whether it was adequate, need not concern us. The point is simply that there is no indication in the record that the jury was "confused" about the timeframe of the abuse alleged in Counts 2-4.

¶ 76                                  C. Proof of specific intent

¶ 77    A person commits an attempt when, "with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a). Defendant claims the evidence of attempt PCSA was insufficient, because the State failed to prove that he had the specific intent to commit PCSA when, as alleged in the indictment, he pushed T.C.'s head toward his exposed penis.

¶ 78    Defendant bases his argument on *People v. Rayfield*, 171 Ill. App. 3d 297 (1988). In that case, the victim allowed the defendant to hold her for a time, but he refused to put her down when eventually she asked him to; instead, he carried her into a bedroom and asked to see her vagina. *Id.* at 298-99. The victim refused, and the defendant left, albeit not before making some physical, but nonsexual, threats toward the victim. *Id.* at 299. Because he did not expose himself, order the victim to disrobe, make any overt act toward the victim's genitals, or even refer to any sexual contact or penetration—he merely asked if he could "see" the victim's vagina—the State failed to prove his specific intent to commit a sexual assault. *Id.* at 299-300.

¶ 79    This case is nothing like *Rayfield*. Here, the evidence showed that defendant grabbed the back of T.C.'s head; pushed T.C. toward defendant's exposed, erect, penis; and told T.C. to "lick it." A rational jury could find, beyond any reasonable doubt, that defendant specifically intended to commit, and took a substantial step toward committing, an act that if completed would have been a predatory criminal sexual assault: namely, contact between defendant's penis and T.C.'s mouth. See 720 ILCS § 5/11-1.40(a)(1) (West 2014).

¶ 80                              II. Evidentiary rulings

¶ 81    Defendant next argues that the trial court committed reversible error in admitting T.C.'s hearsay statements to Parr; in quashing defense subpoenas seeking the testimony and notes of Dr. Robin Palmissano, T.C.'s therapist at the CAC; and in admitting a video of the VSI without a proper foundation.

¶ 82                              A. Hearsay statements to Parr

¶ 83    Section 115-10 of the Code of Criminal Procedure provides that an out-of-court statement made by a sexual-abuse victim under the age of 13, "describing any complaint of such [abuse] or matter of detail pertaining to [the abuse]," may be admitted at trial as a hearsay exception. 725 ILCS 5/115-10(a)(1) (West 2016); see also *id.* § 5/115-10(e) (specifically allowing admission of statements made during interview conducted pursuant to CAC protocol). Before admitting the statement, the trial court must conduct a hearing to determine whether the "time, content, and circumstances of the statement provide sufficient safeguards of reliability." *Id.* § 115-10(b)(1); see *People v. Stechly*, 225 Ill. 2d 246, 313 (2007) (there being no "precise tests" for reliability, courts look to "the totality of the circumstances"). As with any other decision to admit or exclude evidence, we review the trial court's ruling for an abuse of discretion. *Stechly*, 225 Ill. 2d at 312.

¶ 84    Here, the State moved to admit T.C.'s statements to Kaitlin and Parr under section 115-

10. Kaitlin's and Parr's testimony at the pretrial evidentiary hearing was consistent in essentials with their trial testimony. (We will elaborate on finer or additional points as needed.) After the hearing, the trial court found, in sum, that neither Kaitlin nor Parr suggested information to T.C. or led him when he answered questions. Because his statements were shown to be reliable, the trial court granted the State's motion.

¶ 85     Defendant argues that the trial court erred in admitting the VSI statements. (He does not challenge the admission of T.C.'s statements to Kaitlin on the weekend of the barbeque.) His arguments are all variations on two basic themes: the delay in completing the VSI, and Parr's qualifications to conduct the interview.

¶ 86     First, defendant argues that T.C.'s statements to Parr were not reliable because the VSI was not completed in a "reasonable" amount of time. Four months passed between the initial revelation of abuse, on September 27, 2015, and the VSI, on January 28, 2016. But as the State says, the timing element of section 115-10(b)(1) is normally applied to the victim's initial outcry, not to a forensic interview conducted sometime after the initial report of abuse. See, *e.g.*, *People v. Zwart*, 151 Ill. 2d 37, 45-46 (1992); *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 101. (Even then, a significant delay in a child's report of abuse, on its own, does not generally render the statement unreliable. *Zwart*, 151 Ill. 2d at 46.) Indeed, we are not aware of any case in which a delay in completing the VSI, after a timely report of abuse, was found to cast doubt on the reliability of the VSI statements.

¶ 87     Here, defendant does not take issue with the timing of the initial outcry. And the delay in completing the VSI after that initial outcry has a reasonable explanation. Christina Ayala, a forensic interviewer at the CAC, tried to conduct a VSI on October 7, 2015, but T.C. "freaked out" and ran outside to the car. After T.C. completed therapy, the VSI was rescheduled with Parr,

with whom T.C. felt more comfortable talking about "body parts" because he was male. In these circumstances, we cannot agree that an "unreasonable" amount of time lapsed before the VSI.

¶ 88    But the delay becomes significant, defendant argues, when combined with the "substantial adult intervention" it occasioned. The adults involved in this matter at the CAC, he says, "prepped" T.C. for his VSI with Parr. And so they may have coached him to say things he otherwise would not have said, at least not truthfully. More bluntly, they may have convinced T.C. that he was sexually abused, when in fact he was not. As best we can gather, the relevant adults would seem to include Ayala, Palmissano, and Kaitlin, who participated in T.C.'s therapy sessions at the center.

¶ 89    Defendant likens this case to *Zwart*, 151 Ill. 2d at 44-46, in which the supreme court found the victim's statement unreliable, and thus inadmissible under section 115-10, because of the "substantial adult intervention" that preceded it. The circumstances in *Zwart* were critically different than this case.

¶ 90     In *Zwart*, the mother of the 3-year-old victim noticed a bloody discharge in the victim's diaper and signs that she was experiencing pain in that area. *Id.* at 40. But the victim said nothing indicating sexual abuse. Her initial outcry did not come until a week later, when she first told her mother that defendant performed certain sexual acts on her. *Id.* at 41. In the interim—*before* her initial outcry—she had been interviewed by a hospital counselor, a DCFS worker, and a police officer; and in her first interview, she had *denied* that she was sexually abused. *Id.* at 44-45.

¶ 91    The circumstances surrounding her eventual statements to her mother were "particularly troubling," because they raised serious questions about the genesis of her allegations against the defendant. *Id.* at 44. Those questions were especially pressing given the victim's age; a 3-year-old would be highly susceptible to suggestion. *Id.* at 45. And yet those questions could not be

probed, since the State presented no evidence regarding the substance of the three interviews, and the trial court found the victim incompetent to testify. *Id.* at 44-45. Where the victim's outcry statements were made only after three instances of "adult intervention," and the defense was unable to meaningfully examine the substance of those conversations, the outcry statements were not reliable enough to be admitted as a hearsay exception. *Id.* at 46.

¶ 92 Here, in contrast, the "adult intervention" that defendant complains of—the attempted VSI in October 2015; T.C.'s therapy sessions at the CAC in October and November; and a one-on-one meeting between Kaitlin and Palmissano around the same time—took place *after* T.C.'s initial outcry to Kaitlin. Because T.C. had already alleged that defendant sexually abused him, these conversations do not impugn the reliability of his statements to Parr, as did the interviews in *Zwart*.

¶ 93 Consistency, or a lack thereof, in a victim's various statements is, of course, a relevant factor in assessing their reliability. See *Stechly*, 225 Ill. 2d at 313; *People v. Bowen*, 183 Ill. 2d 103, 120 (1998). Defendant asserts that T.C.'s statements to Kaitlin and to Parr were inconsistent with each other. In some details, perhaps, but not in essentials. T.C. told Kaitlin that defendant touched T.C.'s penis in the bedroom on the night of the barbeque; that defendant had done the same thing before; that defendant made T.C. touch defendant's penis; and that defendant tried to put his penis in T.C.'s mouth in the bathroom. Defendant did not add any new allegations when he met with Parr; indeed, his initial outcry encompassed all of the conduct that defendant was eventually charged with. The hypothesis that any of the sessions at the CAC could have been the source of T.C.'s allegations is belied by the record.

¶ 94 Second, defendant argues that the VSI statements should have been excluded because Parr was not qualified to conduct a forensic interview. Specifically, Parr was not licensed as a

clinical social worker when he interviewed T.C., and he did not prove that he had the specific training required by CAC protocol for a forensic interviewer.

¶ 95    Parr acknowledged that he let his clinical social worker's license lapse in 2013. But he testified (at the pretrial hearing, and again at trial) that a forensic interviewer does not need that license. Defense counsel conceded below (at the pretrial hearing, and again on the motion for new trial) that Parr was correct on this point. On appeal, defendant cites nothing—no statute, no case, no CAC protocol—to support his assertion to the contrary. Nor has defendant given us any reason to think that statements made during a VSI could not be deemed reliable, as required by section 115-10, *unless* the interviewer is a licensed social worker.

¶ 96    Defendant also claims that Parr was not qualified to conduct forensic interviews pursuant to the CAC's protocol. The Children's Advocacy Center Act (55 ILCS 80/1 *et seq* (West 2016)) requires every center to meet the accreditation standards set by the National Children's Alliance, including the NCA standards for training forensic interviewers. *Id.* § 80/2.5. Those standards are incorporated in the CAC's protocol, which the State produced to the defense in discovery. It requires a trained forensic interviewer to: (1) have at least 32 hours of instruction and practice; (2) participate in at least 8 hours, every 2 years, of ongoing education in the field of maltreatment and/or forensic interviewing; and (3) participate, at least twice a year, in a structured peer review process for forensic interviewers. Defendant claims that Parr did not meet, or did not demonstrate that he met, these standards.

¶ 97    There are at least two problems with defendant's argument, one legal and one factual. First, the legal problem. Defendant assumes, without argument or relevant authority, that Parr's alleged failure to meet the training standards for a forensic interviewer would render the VSI statements inadmissible under section 115-10. That is not at all obvious. As a general matter, a

statement is admissible under section 115-10 if the "time, content, and circumstances" show it to be reliable. 725 ILCS 5/115-10(b)(1). And the statute does not appear to impose any special requirements for statements made during a VSI. It does say (in a provision defendant fails to address) that otherwise admissible statements "*shall not be excluded* on the basis that they were obtained as a result of interviews conducted pursuant to [CAC] protocol ***." (Emphasis added.) *Id.* § 115-10(e). But it is one thing to say (as the statute says) that a statement is not disqualified just because it was made during a protocol-compliant forensic interview. It is quite another thing to say (as defendant says) that a statement made during a forensic interview *is* disqualified unless the interview is shown to be protocol-compliant.

¶ 98     The trial judge made exactly this point at the hearing, referencing section 115-10(e) and asking defense counsel to identify where in the statute compliance with CAC protocol is required as a condition of admissibility. Defendant had no satisfactory answer then and still does not. The judge was not required to evaluate the VSI statements under any standard other than the ordinary threshold tests for reliability. Applying those tests, the judge found, in sum, that Parr did not ask T.C. any leading questions or suggest any answers or information to him. And defendant does not challenge those findings on appeal.

¶ 99     But even if the statute did require compliance with CAC protocol, including interviewer qualification standards, as a condition of admissibility, defendant's argument would still fail on factual grounds. The record shows that Parr had the required training.

¶ 100   Parr testified to these issues at the pretrial hearing and again at trial. The CAC, he said, was certified by the NCA. He testified to his extensive training in forensic interviewing at La Rabida Children's Hospital and the National Children's Advocacy Center. He had conducted more than 2500 forensic interviews—surely more than the required 32 hours of experience. As

for his continuing training and instruction in the past two years, Parr had attended two-day-long abuse conferences at the CAC, one during the previous year and one during the week before the pretrial hearing. He was also the facilitator for the bi-monthly peer review process for the four centers located in Cook County.

¶ 101   Defendant does not directly contest the truth of Parr's testimony. Nor does he dispute that Parr's testimony, if true, established that he met the NCA standards. Rather, he objects that Parr failed to produce any written documents substantiating his claims. The defense requested copies of course-completion certificates for the conferences (and other online courses) that Parr said he completed. The judge instructed the State to have Parr retrieve those items and produce them to the defense, but also ruled that Parr's testimony would be admissible even without them.

¶ 102   That was not error. Parr could certainly testify to his own training and experience, and if that testimony was found credible, it would establish that he had fulfilled the NCA requirements. Assuming, then, that the requested course-completion certificates or other documents pertaining to Parr's training were never produced (the record does not settle the question one way or the other), why would that matter?

¶ 103   Defendant's argument, at this juncture, drifts from section 115-10 to the rule of *Brady v. Maryland*, 373 U.S. 83 (1963). That rule, he says, was violated by the State's failure to disclose the requested documents to the defense. This argument fails for any number of reasons, the most obvious being that such documents would not be subject to disclosure under *Brady*. Whatever they might be, they are not material, exculpatory evidence. See *id.* at 87-88.

¶ 104   In a last-ditch effort to argue that the VSI statements and Parr's related testimony should have been excluded, defendant says that this evidence was "highly prejudicial" because it falsely implied ("inferred," as he puts it) that Parr was "an expert." Defendant says nothing to support

this assertion. Parr was not tendered as an expert. Neither the State nor Parr ever suggested to the jury that he was an expert. (In what?) To be sure, he had significant experience and training in interviewing young, sensitive victims, but that did not lend any undue weight to his testimony, given that Parr never opined as to whether T.C.'s statements were true. Indeed, Parr explicitly testified that he does not "make a judgment" on such questions. More generally, he did not offer any opinion testimony subject to the foundational requirements of Illinois Rule of Evidence 702 (eff. Jan. 1, 2011). He was a fact witness, reporting what T.C. said to him.

¶ 105   In sum, defendant's arguments fail to show that the trial court abused its discretion in admitting T.C.'s statements to Parr during the VSI.

¶ 106                                B. Palmissano

¶ 107   Dr. Robin Palmissano, a therapist in the family support services program at the CAC, met with T.C. and Kaitlin in late October and early November 2015. Defendant issued two subpoenas to Palmissano, requesting her testimony (at the section 115-10 hearing and at trial) and her notes from those meetings. Palmissano and the CAC moved to quash the subpoenas, arguing that the meetings were therapy sessions and thus protected under the Mental Health and Developmental Disabilities Confidentiality Act ("the Confidentiality Act"). 740 ILCS 110/1 *et seq*. (West 2016).

¶ 108   The trial court found no basis for defendant's assertions that Palmissano conducted a forensic interview and "prepped" T.C. for his VSI, rather than (or in addition to) providing therapy, and thus agreed that Palmissano's testimony and notes were privileged. The trial court granted the motions to quash, thus barring the defense from calling Palmissano as a witness.

¶ 109   Defendant contests that ruling on three grounds. First, the Confidentiality Act does not apply because—as he asserted below—Palmissano was not providing therapy. Second, Kaitlin's participation in the sessions waived any claim of privilege. Third, barring defendant from calling

Palmissano as a witness violated his sixth-amendment right to confrontation. And these errors, he contends, "stymied" his defense.

¶ 110   The Confidentiality Act provides that, "[u]nless otherwise expressly provided for in this Act, records and communications made or created in the course of providing mental health *** services shall be protected from disclosure ***." *Id.* § 110/3(a). Mental health services include (among other things) "examination, diagnosis, [and] evaluation." *Id.* § 110/2. A recipient of such services, or the recipient's "therapist"—who may be a "psychologist" (*id.*)—"has the privilege to refuse to disclose and to prevent the disclosure of the recipient's record or communications" in "any civil, criminal, administrative, or legislative proceeding, or in any proceeding preliminary thereto ***." *Id.* § 110/10(a).

¶ 111   Thus, "[n]o party to any [such] proceeding *** shall serve a subpoena seeking to obtain access to records or communications under this Act unless the subpoena is accompanied by a written order issued by a judge or by the written consent of [the recipient]." *Id.* § 110/10(d). And a therapist's "personal notes," recording any "speculations" or "impressions" about a recipient "are the work product and personal property of the therapist and shall not be subject to discovery in any judicial *** proceeding or any proceeding preliminary thereto." *Id.* §§ 110/2, 3(b).

¶ 112   The Confidentiality Act is "a 'strong statement' by the General Assembly about the importance of keeping mental health records confidential." *Norskog v. Pfiel*, 197 Ill. 2d 60, 71-72 (2001) (quoting *Mandziara v. Canulli*, 299 Ill. App. 3d 593, 599 (1998)). We must "zealously guard against the erosion of the confidentiality privilege" to protect privacy and thus encourage people to seek whatever mental health services they may need. *Id.* at 72. "Consequently, anyone seeking the nonconsensual release of mental health information faces a formidable challenge and must show that disclosure is authorized by the [Confidentiality] Act." *Id.*

¶ 113 Whether the Confidentiality Act authorizes the nonconsensual release of mental health records or information is a question of law that we review *de novo*. *Id.* at 71. But we review the trial court's ultimate decision to admit or exclude evidence—and a claim that evidentiary rulings denied a defendant his right to present a complete defense—for an abuse of discretion. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133.

¶ 114 First, defendant's claim that the Confidentiality Act does not apply turns on his assertion that Palmissano was not providing therapy, but rather "prepping" T.C. for his VSI. As defendant points out, Palmissano did not testify to the purpose or substance of her sessions with T.C. and Kaitlin, either on the stand or by affidavit. But in ruling on the motions to quash, there is much that the trial court had to go on—principally from Parr, the executive director of the CAC, and from representations made by counsel for Palmissano and the CAC.

¶ 115 Palmissano was trained as a psychologist; she held a doctorate in the field. She worked as a therapist in the family support services program at the CAC. Parr testified that Palmissano was not trained as a forensic interviewer, that she did not participate in either the attempted or the completed VSI, and that T.C. was referred to her for a sex abuse assessment.

¶ 116 In her representations to the trial court, counsel for Palmissano and the CAC explained that an abuse assessment is conducted when there is reason to suspect, based on the child's behavior, that abuse may have occurred. An abuse assessment is "independent from a VSI" and is "never conducted when a VSI is already scheduled." And there is "no guarantee that a VSI will be conducted" after the abuse assessment is completed. Rather, it is a "clinical tool," used to "guide interventions" and "determine next steps," if any, in the child's care.

¶ 117 At the section 115-10 hearing, where this matter was also taken up, Parr testified to much the same thing. An abuse assessment is "not part of a forensic process" or "investigation;" it is

not an "interview." Rather, it is "on the counseling side" of CAC's mission, and its purpose is "therapeutic," to give the child a chance, "in a very nondirective way," to verbalize what is going on, so that the counselor can assess whether there is "any issue," be it "abuse related" or "nonabuse related," that might be impacting the child's behavior. Parr explained that some children who come to the CAC for abuse assessments never disclose any alleged abuse but do disclose other issues that may require treatment. The assessment process allows the counselor to determine what treatment might be called for and refer the family to an appropriate provider if the CAC cannot provide the recommended treatment.

¶ 118   The Confidentiality Act applies to the process just described. The abuse assessment was an "examination, diagnosis, [and] evaluation" of T.C., with an eye toward determining what, if any, therapeutic intervention would be appropriate as a result of the alleged sexual abuse (or anything else that may have come to light). See 740 ILCS 110/2. Thus, it qualified as "mental health services." And Palmissano, as a psychologist, was a "therapist" qualified to provide such services. *Id.* Indeed, defendant never disputes any of this. What he disputes is the claim that these representations fairly (or at least exhaustively) describe what Palmissano was doing when she met with T.C. and Kaitlin. In defendant's view, she was really (or also) "prepping" T.C. for his forensic interview.

¶ 119   Defendant offers nothing of substance to support his assertion or rebut the representations by counsel and Parr. The fact that a DCFS investigator encouraged Kaitlin to take T.C. for an abuse assessment does not show that the assessment was forensic rather than therapeutic. Nor does the fact that T.C. apparently disclosed specific acts of alleged abuse during the sessions. (As we discuss in more detail below, the State produced Palmissano's written assessment report in discovery.) Even if Palmissano specifically asked T.C. about any such acts, that does not mean

that she was acting as an investigator rather than a therapist—indeed, how could Palmissano assess what, if any, further therapy would be appropriate for T.C. *without* trying to ascertain what sort(s) of trauma he may have suffered? The question is not whether Palmissano asked T.C. what happened to him—of course she did—but rather what Palmissano did with the information that T.C. disclosed. If, as all available evidence indicates, she used that information to decide on next steps for T.C.'s treatment, then she was acting within her role as a therapist.

¶ 120   What's more, the whole point of defendant's claim that Palmissano may have "coached" or "prodded" T.C. is that *she* might have been the source, or a source, of one or more of T.C.'s allegations against defendant. But for reasons we have already given, the record squarely refutes any such claim. In the VSI, T.C. did not allege any acts of abuse that he had not already alleged in his initial outcry to Kaitlin—*before* he met with Palmissano, or indeed anyone at the CAC. Thus, Palmissano demonstrably did *not* put words into T.C.'s mouth. For this reason, defendant cannot substantiate his claim that she "coached" T.C. while participating in the forensic process. Nor can he show that his defense was prejudiced by his inability to put Palmissano on the stand. See *Burgess*, 2015 IL App (1st) 130657, ¶ 134.

¶ 121   Defendant's principal citation, *Johnston v. Weil*, 241 Ill. 2d 169 (2011), does not support his claim. In *Johnston*, a party to a child-custody dispute asserted that a psychiatrist's evaluation of her was privileged under the Confidentiality Act. *Id.* at 172. The supreme court rejected the claim, finding that the psychiatrist did not provide treatment of any kind to the subject of the report. *Id.* at 183-84. Rather, the psychiatrist had been appointed by the circuit court for the "sole" purpose of "mak[ing] an evaluation for the circuit court to consider" in resolving the litigation. *Id.* Here, in contrast, Palmissano did provide mental health services to T.C.; and while those services did include an assessment or evaluation of T.C., there is simply no evidence that

the assessment was prepared for use in litigation, or that it was ever used for anything other than its intended therapeutic purposes.

¶ 122   In short, there is no evidence that Palmissano's sessions with T.C. were forensic rather than therapeutic, much less that Palmissano put allegations of abuse into T.C.'s mouth. In the absence of any evidence to the contrary, we cannot fault the trial court for concluding that Palmissano faithfully adhered to her role, and thus that her sessions with T.C. and Kaitlin were therapeutic in purpose. Those sessions were protected by the Confidentiality Act, and the trial court properly quashed the subpoenas, seeking Palmissano's testimony and notes, on this basis. See 740 ILCS 110/3(b), 10(a), 10(d) (providing that Act applies in criminal proceedings). And to the extent the subpoenas sought Palmissano's notes, the trial court had a second basis for quashing them: the notes are Palmissano's work product and not subject to disclosure under the Confidentiality Act. *Id.* § 110/3(b).

¶ 123   Second, defendant argues that even if the therapeutic privilege applies, it was waived by Kaitlin's participation in T.C.'s therapy sessions. To the contrary, "[w]hen minors are involved, the therapist-patient relationship necessarily extends to the parents, who act on the minor's behalf" and therefore "have an expectation that the records and communications will remain privileged." *Norskog v. Pfiel*, 314 Ill. App. 3d 877, 882 (2000); *aff'd*, 197 Ill. 2d 60. Because Kaitlin was a party to the therapist-patient relationship, her participation in the therapy did not waive the privilege.

¶ 124   Defendant also asserts that any privilege was waived when the State listed Palmissano as a possible witness and produced her written assessment "in anticipation of using it" at trial. The State's discovery productions notwithstanding, the Confidentiality Act expressly prohibited the defense from issuing a subpoena to Palmissano without first obtaining Kaitlin's written consent

(or a court order). 740 ICLS 110/10(a), (d) (West 2016). There is no evidence in the record that Kaitlin ever consented to a defense subpoena, and in fact every indication, from the motions to quash, that she did not.

¶ 125   In particular, the State's production of the report does not show that Kaitlin consented to a defense subpoena or otherwise waived her privilege under the Confidentiality Act, such that defendant was authorized under the statute to introduce this privileged evidence at trial. As the State points out, the statute permits Kaitlin to consent to the disclosure of the privileged therapy sessions for a limited purpose. *Id.* § 110/5. The State's production may show that Kaitlin agreed to disclose the report to the State, for it to be evaluated as potential evidence in the prosecution of her son's alleged abuser. But that falls short of showing that Kaitlin consented to the defense issuing its *own* subpoena to Palmissano.

¶ 126   To be clear, we are not saying that Kaitlin could consent to the State's exclusive use of the privileged therapy sessions as evidence at trial. That cannot be one of the limited purposes contemplated by the statute. If the State called Palmissano as a witness or otherwise introduced her report into evidence, then defendant could of course cross-examine Palmissano or use her report for his own purposes, if he thought that it supported his theory of defense in some way. With the evidence derived from the privileged therapy sessions now before the jury, defendant's constitutional rights to confront the State's witnesses and present his defense would supersede any statutory requirements. Thus, the scope of the disclosure to which Kaitlin initially consented would no longer control; the question would now be one of defendant's sixth-amendment rights.

¶ 127   But there is no such constitutional question here, because the State did not introduce any of the privileged evidence at trial. Thus, the question remains whether defendant had Kaitlin's written consent to subpoena Palmissano, as the statute expressly requires. And the answer is still

no, regardless of any other limited disclosures that Kaitlin may have authorized.

¶ 128   Lastly, defendant asserts that barring him from calling Palmissano as a witness violated his sixth-amendment right of confrontation. This argument is frivolous and can be dispatched summarily, based on what we have just said. Palmissano was not one of the "witnesses against [defendant]." U.S. Const., amend. VI; see *Crawford v. Washington*, 541 U.S. 36, 51 (2004). Because the State never introduced the assessment at trial, there were no statements—much less testimonial statements—by Palmissano in evidence. See *Crawford*, 541 U.S. at 51-52. There was simply nothing on which defendant could cross-examine Palmissano. He was not deprived of that sixth-amendment right.

¶ 129                                      C. VSI recording

¶ 130   Defendant argues that the State failed to establish a proper foundation for the recording of the VSI that was admitted and played for the jury. Because T.C.'s statements during the VSI were properly admitted through Parr's testimony, any error in admitting the video would almost certainly be harmless. But in any event, the video was properly admitted.

¶ 131   A witness to a recorded conversation can establish a proper foundation for the recording by testifying that it accurately portrays the conversation. *People v. Williams*, 109 Ill. 2d 327, 348 (1985); *In re D.M.*, 2016 IL App (1st) 152608, ¶ 38. In *D.M.*, for example, a proper foundation for a recording of the VSI was established by a detective who observed the interview at the CAC and testified that the video accurately portrayed the interview. *Id.* Here, a proper foundation was established when Parr testified that the video was a true and accurate depiction of the VSI.

¶ 132   Defendant's cited case, *People v. Taylor*, 2011 IL 110067, is irrelevant. *Taylor* addressed the so-called silent witness doctrine, which governs the foundational requirements for video or other photographic evidence—typically, automated surveillance footage—when there *isn't* any

witness who can testify to the accuracy of the image(s). See *id.* ¶ 32. In those circumstances, the evidence may be admissible if the party offering it can demonstrate, in sum, the reliability of the recording (and any duplication) equipment and the competence of the equipment operator(s). *Id.* ¶ 34. The State did not address these matters at trial, as defendant says. But it didn't have to, because Parr testified that the video accurately depicted his interview of T.C.

¶ 133                                   III. Jury instructions

¶ 134   Next, defendant says the jury instructions were erroneous because (1) Illinois Pattern Jury Instruction Criminal 4th (IPI) No. 3.02, the circumstantial-evidence instruction, was improperly given; (2) the issues instruction for PCSA, IPI No. 11.104, should have been modified; and (3) IPI No. 3.11, the instruction on prior inconsistent statements, was improperly refused.

¶ 135   Whether the jury instructions accurately conveyed the law is a legal question reviewed *de novo*, but the trial court's decision to give or refuse any particular instruction is reviewed for an abuse of discretion. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). The trial court abuses its discretion if the instructions are unclear, mislead the jury, or are not justified by the evidence and law. *People v. Cooper*, 2013 IL App (1st) 113030, ¶ 108. In making these determinations, we consider the jury instructions as a whole. *Id.* ¶ 110.

¶ 136                          A. Circumstantial evidence (IPI No. 3.02)

¶ 137   IPI No. 3.02 should be given when circumstantial evidence is presented to the jury. See IPI No. 3.02. The instruction states, "[c]ircumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict." *Id.* Defendant argues that this instruction was improperly given, over defense objection, because no circumstantial

evidence was presented at trial. The "sole testimony," defendant argues, was "T.C.'s hearsay," and that was direct, rather than circumstantial, evidence.

¶ 138   Defendant's argument ignores Kaitlin's testimony, described in more detail above, that she saw defendant running out of the bedroom where T.C. had been sleeping, and that defendant tried to prevent her from entering the bedroom or being alone with T.C., whom she saw sitting up in the bed, naked and looking "bewildered," after having been roused from his sleep. For the reasons we have already explained, this was circumstantial evidence that defendant was guilty of the conduct alleged in Count 1 of the indictment. Thus, IPI No. 3.02 was proper.

¶ 139                    B. PCSA issues instruction (IPI No. 11.104)

¶ 140   Defendant argues that IPI No. 11.104, the issues instruction for PCSA, should not have been given (over defense objection) in its unmodified form. The pattern instruction was inappropriate in this case, he says, because it "did not specify the separate counts." As a result, it confused the jury, given that the evidence indicated, "at most," that only one act of sexual abuse (the conduct alleged in Count 1) occurred. And it violated the one-act, one-crime rule.

¶ 141   To begin, defendant recycles several assertions that we need not dwell on here. We have already addressed, and rejected, his assertion that that there was no evidence to support Counts 2 and 3, which alleged acts of sexual abuse prior to the barbeque. And we will address defendant's invocation of the one-act, one-crime rule in the sentencing context, where he raises this argument again. For now, we will focus our analysis on the alleged instructional error.

¶ 142   In its unmodified form, IPI No. 11.104 apprised the jury that the State had to prove, among other propositions not in dispute, that defendant "knowingly committed an act of [prohibited sexual] contact." The crux of defendant's argument is that the issues instruction for PCSA should have been "broken out to distinguish the three counts" of this offense (as

defendant's tendered, but refused, version of the instruction did). In other words, the trial court should have given the jury three versions of the issues instruction, each incorporating the specific conduct alleged in one count of the indictment.

¶ 143   Defendant cites no relevant authority in support of this proposal. And we see no reason why such redundancy in the issues instruction would have been helpful to the jury. The purpose of an issues instruction is to apprise the jury of the elements of the offense—not the factual basis of the charge—by setting forth those elements as propositions that the State must prove beyond a reasonable doubt. *People v. Olaska*, 2017 IL App (2d) 15056792, ¶ 97 (quoting IPI Criminal 4th, User's Guide, at vii). The issues instruction given here fulfilled that purpose, as it correctly set forth the elements of the offense of PCSA.

¶ 144   Of course, the three PCSA counts, based as they were on three separate acts of alleged sexual contact, needed to be distinguished at some point in the jury instructions. And they were. The jury received, and signed, separate sets of verdict forms for each PCSA count (and another for the attempt). Each set of verdict forms specified one, and only one, of the separate acts of sexual contact alleged in the indictment: Corresponding to Count 1, one set of verdict forms specified "contact between Erik Flores' hand and [T.C.'s] sex organ (09/27/15);" for Count 2, another specified "contact between Erik Flores' sex organ and [T.C.'s] hand (10/20/14-09/26/15);" and for Count 3, a third specified "contact between Erik Flores' hand and [T.C.'s] sex organ (10/20/14-09/26/15)."

¶ 145   The counts were thus "broken out," just as defendant says they should have been. Not in the issues instruction, to be sure, but the counts did not need to be distinguished in *that* context. Indeed, the trial judge reasonably concluded that the verdict forms provided a more succinct, less needlessly redundant, and overall less confusing context for distinguishing the PCSA counts

based on the specific conduct alleged in each.

¶ 146   We see no merit to defendant's assertion that the issues instruction and verdict forms impermissibly "diverged," and that the combination of one issues instruction (for one offense) and three sets of verdict forms (for three distinct counts of that offense) created irremediable confusion for the jury as to whether defendant was on trial for "one crime or multiple crimes." Taken together, the issues instruction and verdict forms clearly and accurately informed the jury as to what the State needed to prove to sustain each count. There was no error in giving the pattern issues instruction for PCSA without the modifications defendant proposed.

¶ 147                    C. Prior inconsistent statements (IPI No. 3.11)

¶ 148   Defendant also argues that the trial court improperly refused his request to instruct the jury on T.C.'s prior inconsistent statements.

¶ 149   The relevant instruction, IPI No. 3.11, states that "[t]he believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind [ordinarily] may be considered by you only for the purpose of deciding the weight to be given the testimony you heard from the witnesses in this courtroom."

¶ 150   IPI No. 3.11 is appropriately given when a witness's testimony and prior statement(s) "are inconsistent on a material matter," that is, "when the contradiction reasonably tends to discredit the testimony of the witness on such facts." (Internal quotation marks omitted.) *People v. Carmona-Olvara*, 363 Ill. App. 3d 162, 169 (2005). Defendant flatly states that T.C.'s trial testimony was inconsistent with his statements in the VSI, but he makes no effort to show that the inconsistencies were "material" within the meaning of our cases. But even if we assume that

they were, the instruction was still not required, because the VSI statements were admitted as substantive, not merely impeachment, evidence.

¶ 151    Our supreme court has long noted the "danger" that juries will treat a prior inconsistent statement that was offered for impeachment purposes as substantive evidence of the truth of the matter it asserts. *People v. Bradford*, 106 Ill. 2d 492, 499 (1985). IPI 3.11 is a limiting or "cautionary" instruction designed to forestall this danger. *People v. Eggert*, 324 Ill. App. 3d 79, 81-82 (2001). To this end, it cautions the jury that a witness's prior inconsistent statement has been admitted to impeach that witness's credibility and may be considered for this limited purpose only. *Id.*

¶ 152    In its note accompanying the instruction, the IPI committee found that this cautionary explanation is warranted in two sets of circumstances: (1) when the witness's prior inconsistent statements are offered only for impeachment purposes, such that no prior inconsistent statements have been admitted as substantive evidence "under Section 115-10.1," and (2) when different prior inconsistent statements have been admitted for different purposes—some for impeachment, others as substantive evidence "under Section 115-10.1." IPI No. 3.11, committee note; see 725 ILCS 5/115-10.1 (West 2016). In the latter circumstance, the instruction should include the bracketed language quote above ("ordinarily"), as well as further language that aids the jury in recognizing *which* of the various statements may be considered as substantive evidence. IPI No. 3.11, committee note.

¶ 153    When a witness's prior statement is offered for substantive purposes, any inconsistencies between that statement and the witness's testimony are fair game for the opposing party. And the jury may, of course, consider those inconsistencies, whether they arise by assertion or omission, in assessing the witness's credibility. But the limiting function of IPI No. 3.11 is not necessary or

even appropriate in these circumstances. The committee thus advised that "[t]here is no need to use this instruction" when all prior inconsistent statements are offered as substantive evidence under section 115-10.1, such that *no* prior inconsistent statements have been offered *merely* for impeachment purposes. *Id.*

¶ 154   And consistent with that recommendation, we have held that IPI No. 3.11 does not need to be given when a prior inconsistent statement is admitted as substantive evidence (under section 115-10.1) and is *also* used, by the opposing party, to impeach the witness who made it. *Eggert*, 324 Ill. App. 3d at 84; *People v. Hood*, 223 Ill. App 3d 157, 161-62 (1991).

¶ 155   Here, T.C.'s out-of-court statements were admitted as substantive evidence. In cross-examination, defense counsel pursued various lines of impeachment. But no prior statement, by T.C. or any other witness, was admitted merely for impeachment purposes. So far, then, this case sounds exactly like the circumstance described in the committee note and the precedents we just cited. It differs in only one respect: T.C.'s statements were admitted as substantive evidence under section 115-10, not under section 115-10.1.

¶ 156   Does that matter? Neither our cases nor the parties address this question. But our answer is no. Whether a statement is admitted as a hearsay exception under section 115-10, or as a prior inconsistent statement that may be considered for the truth of what it asserts under section 115-10.1, the effect is the same: The jury is not limited, as it otherwise would be, to considering the out-of-court statement only as it bears on the credibility of the witness. Yet the whole point of IPI No. 3.11 is to instruct the jury that it may consider the statement (or a subset of the statements) "*only*" for that limited purpose. (Italics added.) IPI No. 3.11. Giving the instruction in these circumstances would, at a minimum, risk confusing the jury. At worst, it would effectively undermine the trial court's ruling that the jury *may* consider the statement(s) in

question as substantive evidence. And that is equally true whether the statement was admitted under section 115-10 or section 115-10.1. The trial court properly declined to give IPI No. 3.11.

¶ 157                                IV. Sentencing

¶ 158   Defendant argues that his sentence was excessive, and thus an abuse of discretion; and that it was based on an error that he alternatively describes as a one-act, one-crime violation or a double enhancement.

¶ 159                          A. Abuse of discretion

¶ 160   Defendant was subject to sentencing ranges of 6 to 30 years for each count of PCSA and 4 to 15 years for attempt PCSA. 720 ILCS 5/8-4(c)(2), 5/11-1.40(b)(1) (West 2014); 730 ILCS 5/5-4.5-30(a) (West 2014). The trial court sentenced him to 8 years for each count of PCSA and the minimum of 4 years for the attempt. Because consecutive sentencing was mandatory (730 ILCS 5/5-8-4(d)(2) West 2014)), his cumulative sentence was 28 years.

¶ 161   In fashioning a sentence, the trial court must balance the seriousness of the defendant's conduct, which is the most important sentencing factor, against his potential for rehabilitation. *People v. Brazziel*, 406 Ill. App. 3d 412, 434 (2010); *People v. Coleman*, 166 Ill. 2d 247, 261 (1995); see Ill. Const. 1970, art. I, § 11. Because the trial court is in the best position to strike this balance, having observed the defendant's character and demeanor, its decision is entitled to great deference and will not be disturbed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A sentence within the statutory limits is not excessive or an abuse of discretion unless it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210.

¶ 162   Defendant says the trial court abused its discretion by failing to "properly consider the mitigating factors," which demanded no more than a minimum sentence of 6 years on each

PCSA conviction. Those factors, he says, included a substantial number of letters in support submitted to the trial court; his "relative lack" of criminal history; his supportive family, age, and consistent employment; and his cooperation with the probation department in his PSI interview.

¶ 163   True, there was significant mitigating evidence. We presume the trial judge considered all of it, unless defendant shows otherwise, bearing in mind that the judge is not required "to recite and assign value to" every mitigating factor. (Citations and quotation marks omitted.) *Brazziel*, 406 Ill. App. 3d at 434. Here, the judge undoubtedly considered defendant's mitigating evidence. The judge stated that defendant "has good qualities to him" and was decidedly "impressed" with the "letters in mitigation," not only their "number" but their "content." It was clear to the judge that "but for these offenses," defendant was "well received" and "welcomed in the community." All of this, as the judge recognized, bolstered defendant's prospects for "rehabilitation."

¶ 164   That said, the judge found that a minimum sentence of 6 years for each PCSA count "was not appropriate" in light of the "seriousness of the offense" and defendant's criminal history. Granted, his prior offenses—a UUW and criminal damage to property as a juvenile; theft and retail theft as an adult—were not nearly so serious as the charges in this case, as defendant points out. But he did have a criminal history, and the judge was entitled to consider that fact.

¶ 165   Defendant acknowledges that mitigating factors do not require a trial court to impose a sentence below the maximum. *People v. Pippen*, 324 Ill. App. 3d 649, 651 (2001). And yet he contends that here, the mitigating factors made any sentence above the minimum unreasonable, as if to say that the seriousness of his conduct—in repeatedly abusing a very young child who had come to trust him as family—could not rationally be given *any* weight in aggravation. (To say nothing of his criminal history.) We cannot agree. The 8-year sentences imposed for each count of PCSA, far below the 30-year maximum, were not excessive.

¶ 166                              B. One-act, one-crime and double enhancement

¶ 167   Defendant argues that the entry of separate judgments and sentences for each of the three PCSA counts violates the one-act, one-crime rule. He asserts, in a nutshell, that the PCSA counts allege (and the evidence at trial proved) only "one act," not three separate acts, of PCSA.

¶ 168   This argument is frivolous. The PCSA counts alleged (and the evidence established) three separate incidents of abuse: (1) defendant touching T.C.'s penis on or about September 27, 2015; (2) defendant touching T.C.'s penis, sometime *before* September 27, 2015; and (3) defendant putting T.C.'s hand on defendant's penis. Because these are three distinct physical acts, each one separately charged in the indictment, there is no violation of the one-act, one-crime rule. See *People v. Crespo*, 203 Ill. 2d 335, 342 (2001).

¶ 169   Lastly, defendant says that because the entry of multiple judgments violates the one-act, one-crime rule, it also "necessarily imposes a double enhancement of the crime." Even if defendant established a one-act, one-crime violation (he hasn't), this argument would have no merit. A one-act, one-crime violation and an impermissible double enhancement are entirely different errors; one does not entail the other. The rule against double enhancement prohibits a court from (1) using an element of the offense as a basis for imposing a harsher sentence than it otherwise would have imposed, or (2) using the same factor to elevate the severity of the offense twice over. *People v. Guevara*, 216 Ill. 2d 533, 545 (2005). Defendant has shown nothing of either kind.

¶ 170                              CONCLUSION

¶ 171    For these reasons, we affirm defendant's convictions and sentences.

¶ 172   Affirmed.